AO106 (Rev. 12/03) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

**ORDERED SEALED BY COURT**

SOUTHERN DISTRICT OF CALIFORNIA

unsealed 4/17/08

FILED
2008 MAR -5 PM 5:01

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ KAH _____ DEPUTY

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

3167 Polk Avenue
San Diego, CA

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: **'08 MJ 0691**

I, Special Agent Brett O'Connor, being duly sworn depose and say:

I am a(n) Special Agent for the Drug Enforcement Administration
*Official Title*
and have reason to believe that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the SOUTHERN District of CALIFORNIA

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed; and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title  21 / 18  United States code, Section(s)  841(a)(1) and 846 / 1956 and 922(g)

The facts to support a finding of probable cause are as follows:

See the attached Affidavit of Special Agent Brett O'Connor

Continued on the attached sheet and made a part hereof:   ☑ Yes   ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

March 5, 2008                    at    San Diego, California
Date                                          City                State

Hon. Cathy Ann Bencivengo    U.S. Magistrate Judge
Name of Judge                   Title of Judge

_____
Signature of Judge

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The target premises located at 3167 Polk Avenue, San Diego, California is a single story, single family residence located on the south side of Polk Avenue. 3167 Polk Avenue has white siding with dark colored trim and a red colored front door. The numerals "3167" are visible on the dark colored trim to the right of the front door to the residence. A photograph of the target premises is shown below.

The search shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and vehicles located on or near the premises, that are owned or under the control of the occupants of such premises, evidenced by prior surveillance, possession of keys, maintenance paper work, title, insurance papers, or registration for such vehicles in the name of the occupants including: (1) a blue 2005 Cadillac sedan bearing California license plate number 5NEB989, and (2) a 1975 Chevrolet vehicle bearing California license plate number 3JGN318.



# ATTACHMENT B

## ITEMS TO BE SEIZED

1. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

3. Weapons, firearms, firearms accessories, body armor, and ammunition and documents relating to the purchase and/or possession of such items.

4. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

5. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant.

6. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras.

7. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

8. Packages and contents that were delivered to the residence, or were about to be sent by the occupants.

9. Drug paraphernalia to include: distribution materials including scales, plastic baggies, electrical and duct tape, and other odor masking materials.

10. Police radio scanners, pagers, cellular telephones, facsimile machines, telephone answering machines, Caller ID system, and prepaid telephone cards.

11. Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and receiving documents relating to the delivery of packages.

12. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

13. Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

14. Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

15. Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

16. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

   a. telephone numbers of incoming/outgoing calls stored in the call registry;

   b. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

   c. Any incoming/outgoing text messages relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, money laundering offenses under 18 U.S.C. § 1956 and firearm offenses under 18 U.S.C. § 922(g);

   d. telephone subscriber information;

   e. the telephone numbers stored in the cellular telephone and/or PDA; and

   f. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, money laundering offenses under 18 U.S.C. § 1956, and firearm offenses under 18 U.S.C. § 922(g).

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

UNITED STATES OF AMERICA )
) SS
SOUTHERN DISTRICT OF CALIFORNIA )

I, Brett O'Connor, being duly sworn, hereby depose and say:

1. I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by special agents of the United States Drug Enforcement Administration ("DEA") for the premises located at 3167 Polk Avenue, San Diego, California (hereafter "the target location") described further in Attachment A.

2. MARK ALLEN KOUNTZ ("KOUNTZ") is the occupant of the target location. On February 22, 2008, KOUNTZ was indicted by the federal grand jury for the Southern District of California and charged with six others in Criminal Case No. 08CR0511-BEN with conspiracy to distribute oxycodone[1] and hydrocodone bitartrate[2] in violation of 21 U.S.C. §§ 846 and 841(a)(1) in violation 21 U.S.C. §§ 846 and 841(a)(1).

3. The purpose of the search warrant is to seize (1) property that constitutes evidence of the commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, money laundering offenses under 18 U.S.C. § 1956, and felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), (2) contraband, fruits of crime or things otherwise criminally possessed, and (3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

---

[1] Oxycodone is a potent and potentially addictive opioid analgesic medication synthesized from thebaine. It is a Schedule II controlled substance both as a single agent and in combination with other products such as acetaminophen, ibuprofen, or asprin.

[2] Hydrocodone is a narcotic which relieves pain by binding to opioid receptors in the brain and spinal cord. Pure hydrocodone, and forms containing more than 15 mg per dosage unit, are Schedule II controlled substances. Controlled purchases and seizures conducted over the course of this investigation to date have involved commercially prepared tablets of hydrocodone bitartrate with acetaminophen, consisting of less than 15 mg hydrocodone per dosage unit and constitute Schedule III controlled substances. All references found herein to "hydrocodone" refer to tablets consisting of hydrocodone bitartrate with acetaminophen.

4. The information contained in this affidavit is based on my personal experience and training, consultation with other special agents of DEA, the Federal Bureau of Investigation ("FBI"), the Criminal Investigation Division of the Internal Revenue Service ("IRS"), officers of the San Diego Police Department ("SDPD") and other law enforcement officers. The evidence and information contained herein was developed from a review of intercepted wire and electronic communications pursuant to prior district court authorization, interviews with sources of information, financial documents secured by grand jury subpoena, surveillance records, vehicle records from the California Department of Motor Vehicles ("DMV"), and public records. The agents' interpretation of code words and phrases are described further in brackets ("[ ]").

### EXPERIENCE AND TRAINING

5. I have been employed as a Special Agent with the DEA since July of 2004. I am currently assigned to Enforcement Group Three within the San Diego Field Division. I have received extensive training in the field of narcotics enforcement. I have attended the DEA Academy at Quantico, Virginia for 16 weeks and have participated in narcotics investigations from street-level distributors to large-scale traffickers. I have interviewed and operated informants, executed search warrants, purchased drugs in an undercover capacity, arrested and interviewed subjects, conducted physical surveillance, utilized electronic and video surveillance, and testified in federal court. I have become familiar with the techniques and methods utilized by drug traffickers. In addition to the above-stated formal training, I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug distribution and trafficking throughout the United States, including Southern California.

6. In the course of my law enforcement experience, I have participated in investigations of crimes involving the importation and distribution of controlled substances and money laundering. I have arrested and participated in the arrests of numerous individuals for various controlled substance violations. I have participated in the execution of search warrants relating to illegal drug offenses. I have received training in the methods used by drug traffickers to import and distribute controlled substances and launder drug proceeds to promote the drug trafficking activity and conceal or disguise the nature, source, and ownership of the drug proceeds. I have conducted and participated in numerous

investigations involving surveillance of individuals associated with drug trafficking. I have conducted and participated in numerous interviews of individuals involved with drug trafficking.

7. Based upon my experience and training, consultation with other law enforcement officers experienced in controlled substances and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

a. Individuals involved in drug trafficking often maintain at their residence records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and coconspirators.

b. Individuals involved in drug dealing must often rely on others to obtain the controlled substances and to help them market the drugs and evidence of the identities of these criminal associates is often maintained at their residence and/or place of business.

c. Individuals involved in drug dealing utilize cellular telephones and personal digital assistants ("PDAs") to maintain contact with co-conspirators and to conduct their criminal activity. Drug traffickers use cellular phones and PDAs, in part, because of their belief in the inability of law enforcement personnel to simultaneously track the originating and destination phone numbers of calls placed to and from their cellular phones and PDAs. Cellular telephones and PDAs contain wire and electronic data concerning telephonic contact, text messages, and electronic mail messages with co-conspirators, as well as telephone books containing contact information for co-conspirators. Members of drug trafficking and distribution organizations also utilize cell phones and PDAs with photograph and video capabilities to take photographs and videos of other members of drug trafficking and distribution organizations, drugs, money, and assets purchased with drug proceeds.

d. Based on prior searches of premises used by individuals involved in drug trafficking, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

   e. Individuals involved in drug trafficking will often conceal contraband and evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.

   f. Individuals involved in drug trafficking earn sums of money and often maintain large amounts of United States Currency at their residence and often hide United States Currency in safes, false compartments, and other locations inside their home. Individuals involved in drug trafficking also try to conceal and disguise the nature, source, and ownership of drug proceeds in a variety of ways including: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; and (3) using the money to buy assets which are hard to trace. Substantial sums of United States Currency and records of financial transactions are often found at the residence maintained by drug traffickers.

   g. Individuals involved in drug trafficking often send and receive packages that contain contraband, money orders, and United States Currency. Packages that contain contraband, money orders, and United States Currency are often found at residences maintained by drug traffickers.

   h. Individuals involved in drug trafficking will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the drug trafficking and money laundering crimes. As discussed further, on February 6, 2008, monitors intercepted a call indicating that KOUNTZ was carrying a firearm while he was looking for KARL DELEON MURRAH. As a result of a prior felony conviction, KOUNTZ is prohibited from carrying a firearm pursuant to 18 U.S.C. § 922(g)(1).

   i. Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at their residences or in their vehicles. Therefore, I am requesting permission to search the residences listed within this warrant and it's attachment(s) for and to seize photographs that law enforcement agents determine to be of evidentiary value.

1       j.      Individuals engaging in drug transportation often use computers to communicate with co-conspirators by means of electronic mail ("e-mail") and for the storage of records. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard drives. Therefore, I am requesting permission to seize computers, including printers, monitors, keyboards, scanners, and all forms of media storage that may be found at the residence.

8.      It is also my opinion and belief that the above-described documents are permanently possessed by drug traffickers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found in the residence despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

9.      The investigation into the criminal activities of KOUNTZ and others reveals that the past drug distribution activities were regular and substantial and may be ongoing. Due to the large quantities of controlled substances distributed, the number of suspected drug transactions, I believe KOUNTZ has been engaged in drug trafficking and possibly money laundering for a long period of time. According to wire interceptions, KOUNTZ was also in possession of a firearm when he tried to meet with MURRAH. Consequently, there is probable cause to believe that there will be historical records of drug trafficking, money laundering, and firearm offenses at the target location.

## OVERVIEW OF THE TARGET SUBJECTS

10.  The following is a brief description of Mark Alan KOUNTZ, and Karl DeLeon MURRAH – two target subjects whose drug trafficking activities provide probable cause for the search warrant on the target location.

    a.  **Mark Alan KOUNTZ** (date of birth: 09/09/1965) is employed as a bouncer at Pure Platinum Strip Club. KOUNTZ purchased large amounts of hydrocodone from MURRAH and distributed hydrocodone to others. KOUNTZ's criminal record includes the following convictions:

| Date | Offense | Sentence |
|---|---|---|
| 04/23/86 | False Information to Police Officer and Take Vehicle Without Consent | 69 days custody and 3 years probation |
| 02/03/87 | Use of Controlled Substance | 3 years probation |
| 04/15/87 | Possession of Controlled Substance | 180 days custody and 2 years probation |
| 05/11/89 | Take Vehicle Without Consent | 225 days custody and 3 years probation |
| 07/17/89 | Attempted Burglary | 60 days custody and 3 years probation |
| 02/05/91 | Keep Place To Sell Cont. Subst. | 103 days custody and 3 years probation |
| 03/01/91 | Under Influence of Cont. Subst. | 370 days custody and 3 years probation |
| 03/18/91 | Possession of Controlled Substance | 10 days custody |
| 09/28/91 | Take Vehicle Without Consent and | 15 days custody |
| 09/28/91 | Under Influence of Controlled Substance | 5 days custody |
| 09/20/93 | Burglary | 6 years custody |
| 05/16/03 | Fighting / Noise / Offensive Words | Infraction |

    b.  **Karl DeLeon MURRAH** (hereafter "MURRAH") (date of birth: 12/08/1978) distributed large quantities of pharmaceuticals, including hydrocodone tablets, to KOUNTZ and others for further distribution. MURRAH is charged in Criminal Case No. 08CR0510-BEN with distribution of MDMA (Ecstasy) in violation of 21 U.S.C. § 841(a)(1). MURRAH is charged in Criminal Case No. 08CR0508-BEN, with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). MURRAH is charged with six others in Criminal Case No. 08CR0511-BEN with conspiracy to distribute oxycodone and hydrocodone bitartrate in violation of 21 U.S.C. §§ 846 and 841(a)(1), and distribution of hydrocodone bitartrate in violation 21 U.S.C. § 841(a)(1).

## FACTS ESTABLISHING PROBABLE CAUSE

### KOUNTZ Conspired With MURRAH To Distribute Pharmaceuticals

11. In 2003, MURRAH sold 250 ecstasy pills to an undercover DEA agent (hereafter "the UC"). On December 7, 2006, the UC met with MURRAH in National City, California and asked MURRAH whether he was still moving "X" [ecstasy]. MURRAH indicated that he moved to "meds" [pharmaceuticals] such as "OxyContin, Vicodin, etc." (brand names for oxycodone and hydrocodone, respectively). MURRAH told the UC that an individual can move a lot of "meds" because the demand was there. MURRAH also said that there was lots of money in that area of business.

12. Toll data from June 2006 to November 2007 reflects approximately 724 contacts between KOUNTZ and MURRAH. From February 2007 to October 2007, monitors intercepted at least 20 drug related calls between MURRAH and KOUNTZ. Based on these interceptions, agents believe that KOUNTZ purchased pharmaceuticals (primarily hydrocodone) from MURRAH at least 11 times – approximately 24,000 tablets of hydrocodone tablets – for further distribution. Several examples of intercepted drug related calls between MURRAH and KOUNTZ are discussed further.

13. On January 4, 2007, the UC met with MURRAH to discuss the sales of pharmaceuticals. Agents observed MURRAH arrive to the meeting in a blue Cadillac sedan bearing California license plate number 5NEB989. This vehicle is registered to KOUNTZ at the target location.

14. On February 2, 2007, at approximately 1:47 p.m., agents intercepted a call between MURRAH and KOUNTZ indicating that KOUNTZ had money to pay MURRAH. During the call, KOUNTZ stated, "… I have some money for you."

15. On February 22, 2007, at approximately 8:08 p.m., agents intercepted a call between MURRAH and KOUNTZ indicating that MURRAH had hydrocodone for KOUNTZ. During the call, KOUNTZ asked, "Hey, you never saved me that six-pack [six bottles of 500 count hydrocodone tablets, totaling 3,000 tablets] huh?" MURRAH replied "Yeah, I have it." Later KOUNTZ asked "Is there a way you can stop by [deliver the hydrocodone] tonight?" MURRAH replied, "Yeah, yeah."

16. On July 16, 2007, at approximately 12:45 p.m., monitors intercepted a call between MURRAH and KOUNTZ indicating that MURRAH had obtained hydrocodone and KOUNTZ wanted to get some from MURRAH. During the call, MURRAH stated, "I'm ready with 18. No. Yeah, 18

7

thousand [18,000 hydrocodone tablets]." KOUNTZ replied, "I could probably use a six pack [six bottles of 500 count hydrocodone tablets, totaling 3,000 tablets]." MURRAH stated "I have these other ones too. That, that are not Wat's, [Watson brand, a manufacturer of hydrocodone tablets] though. Remember the first ones, the Qual's [Qualitest brand, a manufacturer of hydrocodone tablets]?" KOUNTZ replied, "Yeah." MURRAH then said "This is the only time I'm gonna have these though."

17. On July 20, 2007, monitors intercepted a call between MURRAH and KOUNTZ indicating that KOUNTZ wanted hydrocodone from MURRAH. During the call, KOUNTZ stated, "Hey Karl [MURRAH], I was going to see what you were doing tonight and then um, see if you can just take those movies [hydrocodone] to work and give them to Crystal." Monitors later intercepted a call indicating that MURRAH would deliver the hydrocodone to the target location. During the call, MURRAH stated, "I'll just drop it [hydrocodone] off at your house, [target location] whatever." KOUNTZ replied, "Ok, ok." At approximately 1:51 p.m., monitors intercepted a call between MURRAH and KOUNTZ indicating that MURRAH left hydrocodone for KOUNTZ at the target location. During the call, MURRAH stated, "…I put that [hydrocodone] up…you know where… your little hallway to where your room is at, the shelf on the left… I put it [hydrocodone] on the top one [shelf] in a brown bag."

18. On August 15, 2007, monitors intercepted a call between MURRAH and KOUNTZ indicating that MURRAH was going to drop off hydrocodone at the target location and pick-up money left at the target location by KOUNTZ. During the call, MURRAH asked, "How many did you want?" KOUNTZ replied, "I'll probably do a six pack [six bottles of 500 count hydrocodone tablets, totaling 3,000 tablets] if you got it." MURRAH asked, "Yeah, that's fine. Where are you at, home [target location]?" KOUNTZ replied, "I'm home, but I was gonna go work out. The door is open though." MURRAH asked, "Huh?" KOUNTZ replied, "I'm gonna go work out, but I'll leave the door open." MURRAH stated, "I'm dropping off my daughter right now, so." KOUNTZ replied, "Okay, I'll leave some money for you."

19. On October 15, 2007, at approximately 7:53 p.m., monitors intercepted a call between MURRAH and KOUNTZ indicating that MURRAH was to pick-up "30 things"[controlled substance] from KOUNTZ at the target location. During the call, MURRAH asked, "Are you at home [target location] yet?" KOUNTZ replied, "No, I am on my way right now." MURRAH asked, "Hey, can I pick up like 30 of those things for you?" KOUNTZ replied, "Yeah, yeah." MURRAH stated, "I need some to go to Vegas [Las Vegas, Nevada] with." KOUNTZ replied, "Okay." MURRAH stated, "I'll meet you at your house [the target location]."

**KOUNTZ Distributed Hydrocodone**

19. Based on the large quantities of hydrocodone purchased by KOUNTZ and information provided by a Confidential Source of Information for the FBI ("CI"),[3/] agents believe that KOUNTZ purchased hydrocodone from MURRAH for the purpose of further distribution to others. On February 4, 2008, the CI provided agents with historical information regarding KOUNTZ's drug distribution activity. CI was shown a photograph of KOUNTZ and CI positively identified him as "Mark" a bouncer/manager at Platinum strip club. CI stated that he/she has interacted with KOUNTZ on several occasions at Platinum. CI stated that KOUNTZ distributed "yellows" [hydrocodone tablets] inside Platinum. Kountz provided hydrocodone tablets to the girls working at Platinum, who then sold them to the customers. CI stated that, on a few occasions, CI purchased personal use quantities of hydrocodone tablets directly from KOUNTZ.

---

[3/] CI pled guilty to felony drug charges in state court and is awaiting sentencing. On April 17, 2007, CI entered into a Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the agreement, CI agreed to plead guilty to felony charges in state court and assist law enforcement in return for a possible reduction in sentencing. On November 26, 2007, the San Diego District Attorney's Office concluded the Cooperation Agreement by telling CI that he will not receive any further punishment for his/her state felony charges as a result of the cooperation CI had provided thus far. CI then entered into a second Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the second Cooperation Agreement, CI agreed to continue to assist law enforcement in return for a reduction of his/her felony state charges to a misdemeanor. As of December 5, 2007, CI has been reimbursed $2,100 by the FBI for his/her expenses. The information provided by CI has been corroborated and has proven to be reliable.

**KOUNTZ possessed a firearm on February 6, 2008**

20. On January 21, 2008, monitors intercepted a call between MURRAH and Maggie SIEBEN [MURRAH's girlfriend and criminal associate] regarding MURRAH's distribution of controlled substances in Las Vegas. During the call MURRAH stated, "I broke down one thing [one kilogram or one pound of a controlled substance], I broke down one of those things and sell them as little and single things. You know how long it's going to take me to do that, so I can start getting some fucking money? Because I'm in trouble." SIEBEN replied, "I know you're in trouble. That's what's making me worried."

21. On February 4, 2008, monitors intercepted a call between MURRAH and KOUNTZ regarding a dispute. KOUNTZ stated in a voice mail message to MURRAH, "Karl, now you gotta admit dude, this is fuckin' ridiculous dude. Uh, I'm just saying dude, fuckin', this is fuckin' wrong."

22. On February 6, 2008, monitors intercepted a call between MURRAH and an individual named "Stephano," an employee working for MURRAH at MURRAH's business. This call indicated that KOUNTZ had been to MURRAH's business looking for MURRAH. During the call, Stephano stated, "Um, I don't know if you got the message earlier from the shop phone. Mark [KOUNTZ] came by." Later in the call Stephano asked, "It's not MARK KOUNTZ, is he?" MURRAH replied, "Yeah, yeah." Stephano asked again, "It is?" MURRAH replied, "Yeah." Stephano asked, "Bigger guy, dark hair, dark short hair?" MURRAH replied, "Yeah." Stephano asked, "Does he always carry a piece [handgun] with him?" MURRAH asked, "A piece [handgun]?" Stephano LNU stated, "Yeah." MURRAH replied, "I don't know, why?" Stephano stated, "He was [carrying a handgun.]" Later in the call Stephano said, "He was driving, he was driving a blue Cadillac STS." [Based on wire interceptions, agents believe that KOUNTZ may have been trying to locate MURRAH to obtain payment for controlled substances that KOUNTZ previously distributed to MURRAH].

**KOUNTZ's Connection to Target Location**

24. Utility records from San Diego Gas and Electric (SDG&E) reflect that KOUNTZ maintains a SDG&E account for the target location and that the SDG&E account was opened on January 9, 2003.

25. Telephone records from Pacific Bell reflect that KOUNTZ has had a telephone listed in his name at the target location since June 1999.

26. Vehicle records from the DMV reflect that KOUNTZ is the registered owner of the following two vehicles at the target location: (1) a blue 2005 Cadillac sedan bearing California license plate number 5NEB989; and (2) a 1975 Chevrolet vehicle bearing California plate number 3JGN318 registered to KOUNTZ at the target location.

27. KOUNTZ, or vehicles known to be utilized by KOUNTZ, have been observed on numerous occasions at the target location. Vehicles associated with KOUNTZ have been observed at the target location as recently as January 31, 2008.

## SEARCH PROTOCOL FOR COMPUTERS

28. This section describes the procedures that will be employed during this search to minimize the intrusion represented by the search of any electronic data found at the target location.

29. Searching agents will be asked to use an incremental approach in searching for relevant electronic material. If the agents are able to examine relevant portions of computer drives to identify responsive material within a reasonable time period on-site, then the agents will attempt to create forensic images of computers or laptops seized. However, if the agents cannot perform the search within a reasonable period on-site, will they employ alternate procedures to complete the review off-site. In that case, the computer expert will create forensic images of electronic data sources as necessary to complete the search off-site.

30. A forensic image is an exact physical copy of a computer hard drive or other similar electronic storage media. A forensic image thus captures all of the data on the hard drive (or other media) without the data being viewed and without changing the data in any way. There are many reasons why it is not feasible to conduct a forensic analysis of data on-site. First, analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. Second, there are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Third, it is only after a thorough examination and analysis, that a trained computer forensic examiner can determine whether he needs to obtain specialized hardware or software (not to mention

11

specialized training on the specialized software) in order to view and analyze the data contained in electronic form.

31. The analysis of data on a computer may also be an extremely tedious and time consuming process. In addition, to requiring special technical skills, equipment and software, it may take days to properly search a single hard drive for specific data. With current technology, each search "hit" must be reviewed in its context by an agent to determine whether the data is within the scope of the warrant. In other words, merely finding a good "hit" does not end the review process.

32. Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000 megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

33. In addition to the sheer volume, the data may be stored in a variety of formats or encrypted. The volume of data of course extends the time that it takes to analyze the image in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches (e.g., many common electronic mail, database and spreadsheet applications do not store data as searchable text).

34. Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may require off-site analysis.

35. Nevertheless, all forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant. In the course of proper examination, the forensic examiner may view information that is potentially privileged or not within the scope of the warrant. If so, this information will not be made available to the investigating agents unless it appears to the examiner that the information relates to the commission of offenses not covered by this warrant. In that event, the examiner will confer with the investigator and/or the prosecuting attorney so that they can determine whether to seek a further search warrant for the newly uncovered data.

36. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

### SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND PDAS

37. With respect to any and all electronically stored information in cellular phones or PDAs at the target locations, agents respectfully request that this Court authorize the agents to access, record, and seize the following:

    a. telephone numbers of incoming/outgoing calls stored in the call registry;

    b. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    c. Any incoming/outgoing text messages regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and 18 U.S.C. §§ 922 and 1956;

    d. telephone subscriber information;

    e. the stored telephone numbers dialed from the cell phone and/or PDA; and

    f. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, or 18 U.S.C. §§ 922(g) and 1956.

38. If the agents cannot analyze the cellular telephone or PDA on site, they may send the cellular telephone or DPA to the Regional Crime Forensic Lab (RCFL) or the DEA Digital Lab to all analysts or forensic examiners to examine, analyze, and make a record of the contents of the information stored in the seized cellular telephone or PDA.

## CONCLUSION AND SEALING REQUEST

39. Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause to believe that federal crimes have been committed, including controlled substances violations under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, money laundering violations under 18 U.S.C. § 1956, and firearm violations under 18 U.S.C. § 922(g). There is also probable cause to believe that property constituting evidence of the offenses, contraband, fruits of crime or things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing the criminal offenses will be found in the target location described further in Attachment A.

40. Because this is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause the target subjects and others to flee and cause destruction of evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all other associated court records be sealed until further court ordered.

I declare under penalty of perjury that the foregoing is true and correct.

BRETT O'CONNOR
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this ___5th___ day of March, 2008.

HONORABLE CATHY ANN BENCIVENGO
United States Magistrate Judge

14